IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEONARD L. PERALTA, | No. C 08-5435 SI |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| CITY AND COUNTY OF SAN FRANCISCO, *et al.*, | |
| Defendants. | |

Defendant's motion for summary judgment is scheduled for a hearing on February 26, 2010. Pursuant to Civil Local Rule 7-1(b), the Court determines that the matter is appropriate for resolution without oral argument, and VACATES the hearing. For the reasons set forth below, the Court GRANTS defendant's motion.

## BACKGROUND[1]

Plaintiff Leonard Peralta is of Filipino national origin and is a MUNI transit operator employed by defendant Municipal Transit Agency (MTA). Plaintiff began working for MTA in 1995, and in 1996 he became a full-time transit operator in Civil Service Class 9163. On September 19, 2006, plaintiff was promoted to transit supervisor, Civil Service Class 9139. Under the City of San Francisco's civil service rules, plaintiff's employment as a transit supervisor was subject to a one-year probationary period. *See*

---

[1] The parties have filed evidentiary objections. For the most part, the Court does not rely on the evidence to which the parties object, and thus does not address the merits of those objections. To the extent plaintiff objects that certain documents were not authenticated, the Court overrules those objections and finds that defendants have sufficiently authenticated the documents at issue.

Civil Service Commission Rule 17 "Probationary Period" (Hecimovich Ex. B). The Rule provides that "[a]ny person appointed to a permanent civil service position shall serve a probationary period," and the probationary period is defined as "[t]he final and most important phase of the selection process and is to be used for evaluating the performance of an employee in the position to which appointed." *Id*. at Section 117.01.1 and Section 117.03.1.

After being promoted, plaintiff participated in approximately eight weeks of training, from September to November 2006. Plaintiff was then assigned to the Training Division, where he was responsible for providing training to operators. At the Training Division, plaintiff was first supervised by York Kwan. Mr. Kwan supervised plaintiff from November 2006 until June 2007. The parties dispute whether plaintiff had any performance problems while being supervised by Mr. Kwan. Mr. Kwan has submitted a declaration stating that "Mr. Peralta experienced several difficulties performing his duties as a training supervisor during the time he was assigned to my unit." Kwan Decl. ¶ 3. Mr. Kwan states that plaintiff did not adequately document the training sessions, and he states that once the training concluded, "we had to release some of the trainers who had worked on the training to return to other duties, as opposed to reassigning them to other duties in Training. We elected not to reassign Mr. Peralta to another Training position, such that he moved to the Operations Division, where Sarita Britt indicated she believed his extensive experience as an operator would benefit him." *Id*.

Plaintiff, in turn, states that "[a]t no time during Kwan's supervision of me did he ever mention that I experienced any difficulty in the performance of my duties as a training supervisor." Peralta Decl. ¶ 29. Kwan acknowledges that he did not document any concerns he had regarding plaintiff's performance in the Training Division, although he asserts that he communicated his concerns to Britt. Kwan Decl. ¶ 3. Plaintiff has submitted daily evaluation reports while under the supervision of Kwan, and those reports are generally satisfactory. *See* Supp. Peralta Decl. Ex. 1. Although plaintiff asserts that he did not have any performance problems while being supervised by Kwan, he acknowledges that Kwan talked to him and another transit supervisor trainer about an incident when they released their trainees earlier than they were supposed to be released. Peralta Decl. ¶ 30.

In June 2007, Sarita Britt became plaintiff's supervisor, and she supervised him for the remainder of his probation. Britt assigned plaintiff to an additional four weeks of training, and she

2

attended a portion of the training with him. Plaintiff claims that on the first day of training, after exchanging pleasantries, Britt directed her attention toward him and said, "You know, you can always go back to driving." Peralta depo. at 28:23-24 (Hecimovich Decl. Ex. P). Plaintiff testified at his deposition that he believed Britt singled him out because he is Filipino because she did not make a similar comment to another training attendee who was also present. Without admitting that Britt in fact made this statement to plaintiff, defendants assert that this statement "was an accurate reassurance that Peralta had the right to revert to his operator position, while the other attendee – who had already passed his probation as a supervisor – had no such right." Defendants' Motion for Summary Judgment at 5:24-26.

After plaintiff finished the four week additional training, he began working under Britt's supervision. Plaintiff claims that Britt discriminated against him and harassed him on account of his national origin, and as evidence of this discrimination and harassment, he cites her handling of the following incidents. First, when plaintiff parked his truck next to a train track and left the door open while he went to talk to another MUNI employee, Britt radioed him and told him to close the door. Plaintiff testified at his deposition that he felt "intimidated," and "the way she orders things around, I didn't think it was professional or in a professional manner." *Id*. at 28:4-8. In her declaration, Ms. Britt states that she observed plaintiff park his MUNI vehicle, and that the truck door was overhanging the track. According to Ms. Britt, "[t]his constitutes a serious violation of MUNI policies. Not only would a collision result in significant damage to MUNI vehicles, [but] a train colliding with a car can get thrown off track, posing a significant risk of passenger injuries." Britt Decl. ¶ 8. Plaintiff does not address whether leaving a door overhanging a track is a violation of MUNI policies, but asserts that "[t]here were no safety issues involved and no person or vehicle was in danger of harm." Peralta Decl. ¶ 51. Regardless, plaintiff relies on this incident, and in particular how Britt spoke to him, as evidence of national origin discrimination and harassment.

Another allegedly discriminatory incident occurred when Britt asked plaintiff why an operator under plaintiff's supervision was off-loading passengers at the Ferry Building. When asked why he thought that this incident was discriminatory, plaintiff responded, "Again, it is just the manner and the way she speaks on the radio, like trying to scold a kid or something." Peralta depo. at 32:14-16. Peralta

3

testified that, "Again, it just kind of struck as my feeling [] because of her constant badgering of me, like she's constantly hovering overhead like a hawk and just looking for anything to get me." *Id*. at 34:18-22.

A third allegedly discriminatory incident occurred when Britt instructed plaintiff to ticket a driver parked in a bus lane. Plaintiff described the incident as follows,

> There was this delivery truck parked in the bus zone delivering these goods to the restaurant, I do believe. Anyway, she came up to me and says, "What is that truck doing in the bus zone?" So I said, "He's delivering, and he won't be long." And she ordered me right away to go up to that truck and issue him a parking ticket. Again, it's just the manner and the way she said that that really was getting to me.
>
> So I went to see the driver of that delivery truck and told him that, "Okay buddy, I was told by my manager to get a hold of you and talk to you and give you a ticket."
>
> But since I understood that he's also trying to earn a living and not exactly in the way of the other buses on that certain line, I says, "Okay. If you could just kind of hurry things up so we'll be good. I do understand you have to earn a living also, and you are not exactly in the way, so I will not issue you a ticket."

*Id*. at 44:3-24. Plaintiff testified that it was one of his duties as a transit supervisor to issue tickets to vehicles parked in bus zones. *Id*. at 45:20-23.

Plaintiff also believed that Britt discriminated against him when she told him on two occasions that he should complete line-monitoring reports differently. Britt told plaintiff that instead of leaving blank spots on his "line check,"[2] he should write "out on call." *Id*. at 66:22-67:16. Plaintiff testified he felt these instructions were discriminatory and harassing because of Britt's "tone of voice and the manner of the way she speaks." *Id*. at 69:3-4.

On September 7, 2007, Britt met with plaintiff and plaintiff's union representative, and Britt informed plaintiff that he was not performing up to the standards of a transit supervisor, and that he would need to remain in a probationary status for an additional three months if he wanted to continue to work toward a permanent position. Plaintiff told Britt that he considered any problems to be the result of Britt's failure to provide him with adequate training. The parties dispute whether plaintiff was also informed that, under the Memorandum of Understanding, if plaintiff elected to extend his probation beyond the one-year mark and failed to pass his probation, he forfeited his seniority as a driver. In a

---

[2] Plaintiff testified that a "line check is just to see how the line is going, whether everybody is on time or delayed in the line." *Id*. at 69:19-21.

4

letter dated the same day, Britt informed plaintiff that "We are extending your probation because of improvement needed. There are elements of the job where your supervision skills are lacking; this is based on the evaluations we have received from your line training and your actions out in the field. Your probation will be extended three months extra from your original probation date September 25 to December 25, 2007." Hecimovich Decl. Ex. C.

In late September or early October 2007,[3] Central Command called plaintiff regarding a situation with late trains. According to Britt, "[d]espite the urgency of this situation, Leonard decided to go talk with another operator about unrelated issues rather than continue to monitor the changes. I radioed Leonard to express my concern and instruct him to return immediately to ensure that the switch-over was successful and to continue to monitor the situation for potential follow-on problems." Britt Decl. ¶ 12. Plaintiff disputes that he handled the situation incorrectly, and objected to Britt "interrupting" him. After the exchange, plaintiff filed a formal complaint against Britt in an October 6, 2007 letter to Senior Operating Manager George Louie. The letter states,

> I would like to file a formal complaint regarding the unprofessional conduct of acting MRO Manager, Ms. Sarita Britt, on September 26th at 12:30 pm. I was assisting an Operator who was ready to pull out and asked for her paddle in order to put her on the schedule. Ms. Britt then called me over the radio and asked what was going on. As I proceeded to answer her questions and in trying to explain, she continued to interrupt me with more questions without allowing me to finish and assist the Operator.
>
> This occurred over the air wave (Radio: Channel 6) where if anyone were to tune in, they can overhear what was going on. We are professionals and should treat each other with respect, however after this event, I do not feel that Ms. Britt gave me the same respect we all deserve. Meet and Greet Personnel, MRU Supervisor Topps, Supervisor Wells and Supervisor Parsons are witnesses to Ms. Britt's unprofessional conduct, public embarrassment and humiliation.
>
> If there is anything further I should provide in addendum to this complaint, please advise.

Hecimovich Decl. Ex. E.

After plaintiff sent the October 7, 2007, he felt that Britt's "badgering" of him stopped. However, he alleges that she retaliated against him by "setting him up" by requiring him to work on October 31, 2007, at the West Portal station. The parties' accounts of what happened differ. Britt's declaration states,

---

[3] The record is unclear on the date of this incident.

5

> Leonard was instructed that run 135 would be the last train to remain in service through West Portal, and that he needed to be prepared and in place to direct all subsequent trains to turn around at West Portal station instead of passing through. After run 135 entered the station, Leonard failed to stop the following train. Another senior manager and I rushed over to implement the directive. Ultimately we had to allow the train through, as it was too late to stop it. In addition, despite the fact that we were essentially doing Leonard's job for him, Leonard failed to coordinate the motor coach shuttles he was supposed to have lined up, such that they were late, causing further delay.

Britt Decl. ¶ 13. Plaintiff describes the incident as follows,

> I was scheduled to be off on October 31, 2007, but for reasons at that time unknown to me, Britt insisted that I work on October 31, 2007, even though veteran supervisors had been assigned to work on that extremely busy night. Instead, I was required to work. I performed all of my duties satisfactorily that night and was not responsible for the purported problem with allowing any train after 135 to come through the tunnel. At that time, I had directly notified George Louie, that I was compelled to go to the restroom during which time train number 135 strangely arrived earlier than scheduled and when I was in the restroom. I realize now that I had been "set up" for the sole purposes of fabricating a criticism of my performance that night.

Peralta Decl. ¶ 63.

In a memo dated November 30, 2007, Britt recommended to Louie that plaintiff be released from his probationary assignment and returned to operator status. Hecimovich Ex. H. Britt provided various reasons for her recommendation, including the October 31, 2007 incident. *Id*. On December 14, 2007, MUNI released plaintiff from his probationary assignment. *Id*. Ex. I. The release was non-disciplinary, which allowed plaintiff to revert to his prior operator classification. *Id*.

Plaintiff filed a union grievance challenging the decision to release him from his probationary assignment. *Id*. Ex. J. The grievance asserted that Britt failed to provide plaintiff with adequate training, claimed that Britt was "unprofessional," that plaintiff was subject to "constant harassment" and "public embarrassment and humiliation," and accused Britt of "set[ting] me up" on October 31, 2007. *Id*. The grievance does not claim that Britt discriminated against plaintiff on account of his national origin. After plaintiff was not reinstated to the supervisor position, he filed a charge of discrimination with the California Department of Fair Housing and Employment, alleging discrimination on account of race and national origin, and retaliation. Compl. Ex. 1. This lawsuit followed.

## LEGAL STANDARD

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories,

1 and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

### I. Discrimination claims (Title VII, FEHA, 42 U.S.C. § 1981)

Plaintiff's first, third and fourth claims allege that defendants discriminated against plaintiff on account of his national origin when Britt extended plaintiff's probationary period in September 2007 and then revoked his probation in December 2007, at which time plaintiff returned to his previous position as a transit operator.[4] Defendants contend that plaintiff cannot establish a *prima facie* case

---

[4] Upon plaintiff's release from probation, plaintiff took several days of unpaid leave. Plaintiff's summary judgment opposition suggests that he challenges the failure to pay him for this leave as discriminatory. However, plaintiff did not include any allegations about unpaid leave in his DFEH charge or his complaint, and thus he is precluded from litigating this issue here. *See Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002); *Okoli v. Lockheed Technical Operations Co.*, 36 Cal. App. 4th 1607, 1614-17 (1995). In any event, even if this claim was exhausted, plaintiff has not submitted any evidence to suggest discrimination in relation to the unpaid leave.

7

because he does not have any evidence suggesting that Britt discriminated against plaintiff on account of his national origin.

Plaintiff may establish a *prima facie* case of discrimination by showing that: "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 604 (9th Cir. 2004); *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 353 (2000). "A plaintiff's failure to offer evidence establishing a necessary element of his prima facie case will ordinarily be fatal to his claim." *Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002).

Here, plaintiff has not submitted any evidence raising an inference of race or national origin discrimination. Instead, all of plaintiff's "evidence" consists of his subjective beliefs that Britt "singled him out," spoke to him unprofessionally, treated him like a child, and so forth, because he was Filipino. Plaintiff was repeatedly asked during his deposition if Britt ever made any comments about plaintiff's national origin: the answer was always no. Plaintiff's speculation that Britt's actions were motivated by discriminatory animus is insufficient to meet his burden on summary judgment. *See Foss v. Thompson*, 242 F.3d 1131, 1134 (9th Cir. 2001) (affirming summary judgment where "the evidence, viewed in the light most favorable to Foss, establishes that Daniel Madrano, who was in charge of personnel, told him headquarters had turned down his request but that Madrano did not know why. Any inference that the decision was motivated by age or race animus would be pure speculation."); *see also Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1410 (9th Cir. 1987) (plaintiff disc jockey who was fired for failure to comply with station's decision to convert to English-only format failed to establish *prima facie* case of racial discrimination where "[t]here is no genuine dispute that the order was a programming decision motivated by marketing, ratings, and demographic concerns" and not racial discrimination). Accordingly, the Court concludes that plaintiff has failed to make out a *prima facie* case of national origin discrimination, and GRANTS summary judgment in favor of defendants on these

claims.[5]

## II.     Retaliation claims (Title VII, FEHA, 42 U.S.C. § 1981)

Plaintiff's second, third and fifth claims allege that Britt "set him up" on the October 31, 2007 assignment in retaliation for filing the October 7, 2007 formal complaint against her. Defendants contend that plaintiff cannot make out a *prima facie* claim of retaliation because he did not engage in any protected conduct.

A plaintiff establishes a *prima facie* case of retaliation by showing "(1) involvement in protected activity opposing an unlawful employment practice, (2) an adverse employment action, and (3) a causal link between the protected activity and the adverse action." *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006); *see also Guthrey v. State of California*, 63 Cal. App. 4th 1108, 1125 (1998). "The employee's statement cannot be 'opposed to an unlawful employment practice' unless it refers to some practice by the employer that is allegedly unlawful." *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983); *Sada v. Robert F. Kennedy Med. Ctr.*, 56 Cal. App. 4th 138, 160 (1997).

Here, plaintiff's October 7, 2007 letter does not constitute "protected activity opposing an unlawful employment practice" because he does not complain about any discrimination or unlawful practices. Instead, plaintiff complained about perceived "unprofessional" conduct by Britt. Unprofessionalism is not tantamount to unlawful discrimination. *Cf. Crown Zellerbach*, 720 F.2d at 1013 (finding protected conduct where letter "specifically mentioned the history of unlawful employment practice charges filed against [Crown] by black employees pursuant to Title VII."); *see also Carrasco v. San Ramon Valley Unified Sch. Dist.*, No. C 04-2395 CRB, 2005 WL 3260607, at *6 (N.D. Cal. Dec. 1, 2005) (granting summary judgment and finding no protected activity where "[a] reasonable jury could not find that plaintiff's opposition to the District's treatment of Mary Glenn was conduct protected by Title VII because plaintiff never in fact protested that the District was *discriminating* against Glenn) (emphasis in original). Accordingly, the Court concludes that plaintiff has failed to make out a *prima facie* case of retaliation, and GRANTS summary judgment in favor of defendants.

---

[5] In light of this disposition, the Court finds it unnecessary to address defendants' alternative arguments regarding plaintiff's § 1981 discrimination claim.

9

### III. Harassment (FEHA)

Plaintiff's sixth claim alleges that he was subject to a "continuous pattern of harassment" on account of his national origin. To be actionable, harassment must be "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment" *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 608 (1989). "The plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that she was actually offended." *Id*. at 609-10. "[H]arassment cannot be occasional, isolated, sporadic, or trivial[;] rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature." *Id*. at 610. FEHA harassment claims are evaluated under the same standards as Title VII harassment claims. *See Aguilar v. Avis Rent A Car System*, 21 Cal. 4th 121, 130 (1999). To constitute harassment, the workplace must be both subjectively and objectively abusive. *See id*.

Defendants contend that plaintiff cannot meet his burden of proving actionable harassment based on his national origin. The Court agrees. As discussed *supra*, plaintiff does not have any evidence of animus based on race or national origin. Moreover, none of the claimed instances of "harassment" rises to an objectively abusive level. Plaintiff's deposition testimony sums up his harassment claim:

Q: Are there any statements that Ms. Britt made that lead you to believe that her conduct towards you was because you are Filipino?

A: Well, being isolated and singled out, it gave me that kind of frame of mind.

Q: Okay. But specifically my question is whether she made any comments to you that led you to believe that.

A: Again, a succession of all those things. I cannot say anything specific, but if you were in my situation, the constant badgering, being singled out all the time, being treated like a kid. And for an adult and professional, I would like to be treated like an adult and also a professional, which she wasn't doing.

Q: Okay. And did she ever make reference to your being Filipino at all?

A: No.

Q: Your complaint also says that you were subjected to continuing harassment.

10

> Was there any harassing conduct that you were subjected to aside from what we've been talking about?
>
> A:   Well, I would consider all those things harassment.

Peralta Depo. at 70:22-71:19 (Hecimovich Decl. Ex. P).

Although plaintiff may have subjectively felt that Britt's conduct was harassing, it is not objectively abusive. Instead, taking the evidence in the light most favorable to plaintiff, Britt frequently criticized plaintiff regarding his work, used a demeaning tone when she spoke to plaintiff, and "singled him out" when she told him he could return to being an operator. The Ninth Circuit has held insufficient similar (and often much stronger) harassment claims. *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 642-43 (9th Cir. 2003) (plaintiff claimed supervisor made two racial comments, yelled at plaintiff in front of others, and made false complaints against plaintiff); *Kortan v. California Youth Authority*, 217 F.3d 1104, 1107, 1111 (9th Cir. 2000) (although supervisor called female employees "castrating bitches," "Madonna," or "Regina" on several occasions in the plaintiff's presence and called the plaintiff "Medea," his conduct was not severe or pervasive enough to unreasonably interfere with the plaintiff's employment). Plaintiff has not presented any evidence that even rises to the level of the offensive and derogatory slurs made in *Kortan*, and accordingly the Court GRANTS defendant's motion for summary judgment on this claim.

## IV.   Constitutional discrimination claim

Plaintiff's seventh cause of action is brought under Article I, Section 8 of the California Constitution, and alleges discrimination on account of national origin. This section provides that "A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed color, or national or ethnic origin." Cal. Const., Art. I., § 8. "[A] claim brought directly under Article I, § 8 of the California Constitution may only be brought where a plaintiff has been denied entrance into a profession or particular employment or terminated from the same." *Strother v. Southern Cal. Permanente Medical Group*, 79 F.3d 859, 871 (9th Cir. 1996); *see also Himaka v. Buddhist Churches of America*, 919 F. Supp. 332, 335 (N.D. Cal. 1995) (Article I, Section 8 does not support claim for "wrongful failure to provide equal promotional opportunities or

11

equal working conditions").

Here, plaintiff does not allege that he was barred from his profession, and the record shows that plaintiff continued working as a transit operator after his supervisory probation ended. In addition, for all of the reasons stated above, plaintiff has failed to raise a triable issue of fact on his discrimination claims. Accordingly, the Court GRANTS summary judgment in favor of defendants.

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment. (Docket No. 28).

**IT IS SO ORDERED.**

Dated: February 22, 2010

SUSAN ILLSTON
United States District Judge